UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| GINGER JAMES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09-CV-0456-CVE-FHM |
| | ) | **BASE FILE** |
| and | ) | |
| | ) | Consolidated with |
| | ) | **Case No. 09-CV-0457-CVE-FHM** |
| DEBORAH TENNISON, | ) | |
| | ) | |
| | ) | |
| Consolidated Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| INDEPENDENT SCHOOL DISTRICT NO. | ) | |
| I-050 OF OSAGE COUNTY a/k/a Prue Public | ) | |
| Schools, RON MEADOWS in his individual | ) | |
| and official capacity, GERALD JACKSON in | ) | |
| his individual and official capacity, VALERIE | ) | |
| TRASTER in her individual and official | ) | |
| capacity, and SYLVIA HENDRICKS in her | ) | |
| individual and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court is Defendants' Motion for Summary Judgment (Dkt. # 40).[1] Plaintiffs

Ginger James and Deborah Tennison (together, plaintiffs), former employees of Independent School

District No. I-050 of Osage County, Oklahoma (the School District or the District), bring the

following claims against the District and individual members of the District Board of Education (the

Board of Education or the Board): claims under 42 U.S.C. § 1983 for violation of their substantive

and procedural due process rights and free speech rights; and state law claims for breach of

---

[1]     Case No. 09-CV-0456-CVE-FHM (Ginger James, plaintiff) and Case No. 09-CV-0457-
CVE-FHM (Deborah Tennison, plaintiff) were consolidated for discovery and trial.

employment contracts, intentional interference with their employment contracts, and conspiracy to interfere with their employment contracts and violate their due process and free speech rights.  Dkt. # 2.  Defendants seek summary judgment on all claims.  Dkt. # 40.

On August 31, 2010, the Court entered an Opinion and Order (Dkt. # 65), granting in part and denying in part defendants' Motion to Strike Inadmissible Evidence and Improper Argument in Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. # 57). The Court will not consider the evidence stricken from Plaintiffs, Ginger James and Deborah Tennison, Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. # 52).

## I.

James was employed as the District elementary school principal from at least  July 1, 2006[2] through February 23, 2009.  Dkt. ## 41-6, at 2; 52-2, at 4.  Tennison was employed as the District high school principal from July 1, 2005 through February 23, 2009.  Dkt. # 41-2, at 4.  The individual defendants, Ron Meadows, Gerald Jackson, Valerie Traster, and Sylvia Hendrix,[3] were four of the five members of the Board of Education during times relevant to this matter.

A.      Plaintiffs' Employment History with the District

On March 10, 2008, the Board consisted of Meadows, Jackson, Traster, Don Horton, and Carrie Currie.  Dkt. # 43-2, at 1-2.  Sylvia Hendrix replaced Currie on May 3, 2008.  Dkt. ## 41, at 8; 52, at 4.  On February 23, 2009, the Board consisted of Meadows, Jackson, Traster, Horton, and

---

[2]      There is no evidence in the record of when James's employment with the Prue School District began.  However, it is undisputed the Board voted on the renewal of James's contract for the 2007-08 school year.  Dkt. # 52-2, at 4.

[3]      Hendrix's name was mis-spelled in the complaints.

Hendrix.  Dkt. # 41-17, at 1.  Prior to being on the Board, Meadows had, at one time, been the superintendent of the District.  Dkt. # 52-5, at 1;

On April 9, 2007, the Board voted on the renewal of plaintiffs' contracts for the 2007-08 school year.  Dkt. # 52-2, at 3-4.  On that date, the Board consisted of Horton, Ronald Millburn, Jackson, Ruth Meyer, and Traster.  Dkt. # 52-2, at 1.  Jackson and Traster voted no, and the other Board members voted yes.  Id.  Plaintiffs were re-employed for the 2007-08 school year.  At the same Board meeting, Millburn made a statement that he had received telephone calls expressing concern that the Prue School District was in financial trouble and shutting down.  He stated that "[w]e have $659,522.80 cash on hand, the school is in financial good shape, the best its been in years."  Id. at 5.

On March 10, 2008, the Board unanimously voted to renew James's and Tennison's employment for the 2008-09 school year.  Dkt. # 43-2, at 2.  On that date, the Board consisted of Meadows, Jackson, Traster, Horton, and Currie.  Dkt. # 43-2, at 1-2.   The Board unanimously approved plaintiffs' contracts on July 28, 2008.  Dkt. # 43-2, at 4.

Tennison's and James's Certified Administrator Contracts for the 2008-09 school year were identical in all material respects.  The contracts commenced on the date that the administrator reported for work and continued through June 30 of the next year.  Dkt. # 52-15, at 1; 5.  The "Termination Events" sections provided that the contract would terminate upon, among other events, "[t]he dismissal or nonrenewal of Administrator by District . . . ."  Id. at 2; 5.  It further provided that "[a]ny suspension, dismissal or nonreemployment of Administrator shall be effectuated in accordance with the law applicable to full-time certified administrators.  Id. at 2; 5.  It is undisputed that plaintiffs' contracts entitled them to pretermination hearings.

B.      The Investigation into the School District's Financial Condition

In November 2008, Meadows and the Board's counsel discussed authorizing the Tulsa law firm of Rosenstein, Fist and Ringold to conduct a review of District finances.  Dkt. # 52-17, at 1. Tim Green was hired to perform a review.  Dkt. # 52-18, at 2.  The superintendent at that time was Randy Cottrell.  Green found that the District's finances were in disarray, and that the treasurer had not been keeping proper records.  The treasurer was dismissed by the Board, and the Board hired Debora Jones as treasurer, and Douglas Jones as assistant treasurer.  Dkt. # 41-7, at 5.

Douglas Jones (Jones) found that the District's budget had decreased by $205,000 from the previous year.  Dkt. # 41-8, at 14.  The District ended the 2007-08 school year with a $328,000 fund balance, but had overspent its income by $105,000.  Id. at 15.  He found that the district had maintained the same level of spending in 2008-09 as in 2007-08.  Id.  Jones testified,

> if you take the $200,000 decrease in the budget and the $105,000 overspent from the year before, and you had a little over $300,000 fund balance to start the year, that means you're going broke at the end of the year.  That was my initial reaction.

Dkt. # 41-8, at 16.  Jones developed best and worst case scenarios and determined that the District would end up with a balance of between $62,000 or negative $22,000.  Id. at 18.  He reported this to the Board at the January 2009 Board meeting.  Id. at 19.  Jones informed the Board that the District was in a financial crisis and they would have to look at every possible way to reduce expenses.  Id. at 22.  He did not make any specific recommendations as to how the District should reduce expenses, but "made it clear that the board needed to do something. [Jones] felt that they were operating at a level that they couldn't sustain."  Id. at 3.

On February 2, 2009, the Board voted to accept Cottrell's resignation.[4]  Dkt. # 41-11, at 4. A report was made concerning the District's financial condition, and the Board discussed ways in which the District could reduce expenses for the 2008-09 school year.  Jackson recommended "that when everyone leaves the room shut off the lights, and turn up or down the thermostat when being out of the room for a long period of time."  Dkt. # 41-11, at 6.  The Board went into executive session to discuss the employment of all administrators.  Id.  The Board unanimously voted to notify James and Tennison of their possible dismissal.  Id. at 7.

C.      Tennison's and James's Hearing and Terminations

The next day, the Board's counsel, John Moyer, sent letters to Tennison and James stating that he would recommend to the Board that they be dismissed from employment with the District. The stated reasons were:

1. Due to a lack of funds.

2. Elimination of the full time [High School/Elementary School] Principal position.

3. It is in the best interest of the district that you be dismissed.

It is anticipated that if the District continues to spend at its current rate, the District will deplete its funds prior to the end of the fiscal year.  In order to meet its financial obligations, including the payment of salaries of teachers and other District employees, the School District must immediately address this financial emergency. This recommendation is designed to cut costs while still providing the best education possible to the District's students during this time of crisis.

Dkt. # 52-24, at 1.  The letters also notified plaintiffs of their right to a hearing before the Board. Both plaintiffs requested hearings, which were held together.  Plaintiffs' attorney requested, among other materials, financial data demonstrating the asserted lack of funds.  Dkt. # 52-25, at 1.  Moyer

---

[4]      Traster voted against accepting his resignation.  Dkt. # 41-11, at 4.

responded, "[t]he procedures mandated by Oklahoma Statutes do not provide for discovery; therefore, I do not intend to spend time and scarce school funds responding to your requests. Both Ms. James and Ms. Tennison have access to the materials which you have requested, and they have been in attendance at virtually every meeting the Board of Education has held during the current school year, including those in December, 2008, and January, 2009, when the financial condition of the District was broadly discussed." Dkt. # 52-26, at 1.

The hearing on James's and Tennison's employment was held on February 23, 2009. Dkt. # 41-7. Julie Miller of the Oklahoma School Board Association served as the hearing administrator. Moyer made an opening statement arguing that "[t]he District's current arrangement for providing administration as well as its economic condition is such as we can no longer afford two full time principals at the Elementary and High School." Dkt. # 41-17, at 3. Plaintiffs' counsel made an opening statement. He objected to the sequestration of plaintiffs' financial witness, Bill Bentley. He stated that he did not get any documentation from Moyer or from the school. Dkt. # 41-17, at 4. He objected to the fact that "the letter in this case recommending this dismissal was made by the attorney, Mr. Moyer, not anyone associated with the school district, as far as the superintendent, interim superintendent or anything of that nature or the president of the board . . . ." Id. at 5. He also stated that at least three or four Board members were biased towards Tennison and James, and that "[t]here is a long history here and we believe this is a sham, it's a farce, it['s] made up, and when Mr. Meadows became president of the school board almost a year he has basically taken charge of the finances. . . . So we have impropriety as far as people campaigning about getting rid of these principals prior to getting elected requesting that administration terminate these employees prior to this mirage of having a reduction of force." Id.

6

The District called James as its first witness.  James testified that she did not have any particular knowledge of the financial condition of the District.  Dkt. # 41-17, at 6.  She testified that the District has fewer than 320 students.  Id. at 9.  The District then called Jones.  Jones testified that 75% of District expenditures went to personnel expenses.  Id. at 17.  He testified that a school district of the District's size could cut very little spending without cutting personnel expenditures because very little of the non-personnel expenses are discretionary.  Id. at 18.  Jones testified that he projected the carry over balance for the 2008-09 school year to be "just about zero."  Id.  He had to base his projection on a comparison of expenses because "there hadn't been a clear budget projection made by the previous superintendent or the [treasurer], and so in record of that all you can do is start tracking expenses from the past year and current years."  Id. at 19 (as in original).

Jones's testimony was consistent with the report he had previously given to the Board.  He stated that the District's budget was less than the previous year's, and that expenses were the same as the previous year's.  Dkt. # 41-17, at 20.  He stated that "the board will have to look at every program in the district going forward to see where money can be saved."  Id. at 24.  He also testified that the District's administrator costs were high, and that "typically a district of this size does not have as many administrators."  Id. at 25.  He testified that it was not financially feasible for the District to fund three and a half administrators.  Id. at 27.  Finally, he stated that, if nothing were done, the District's financial condition could lead to the schools being shut down by the end of the year.  Id.  Plaintiffs' counsel cross-examined Jones.  Id.  Counsel implied that the Board should have anticipated the loss of revenue prior to the beginning of the 2008-09 school year.  Id. at 31.  Counsel asked Jones if he was involved in a conspiracy to get rid of plaintiffs or if he harbored animosity towards them.  Jones said no.  Id. at 35.

7

Horton is of the opinion that Jones did not have sufficient information to make a determination as to the school district's financial condition in February 2009, when Jones testified at the hearing.  Dkt. # 52-9, at 5.  Jones admitted that, in February 2009, he would not have had time to do a complete historical financial study of the District.  Dkt. # 52-28, at 13.  Jones was asked to make overall projections.  Id.  Jones did not review Green's report as part of his analysis.  Dkt. # 52-28, at 24.

Plaintiffs then presented their evidence.  They called Bill Bentley.  Bentley is a retired school superintendent who was, at one time, an agent with the  Federal Bureau of Investigation.  Dkt. # 41-17, at 38.  He is currently an employee of Professional Oklahoma Educators and on the board of directors of the organization's foundation.  Dkt. # 41-20, at 2-3.  At the time of the hearing, Bentley was on the board of the organization itself.  Id. at 4.  Bentley testified that, as part of his investigation of plaintiffs' case, he asked for a copy of the District's expenditure reports and was told that they were unavailable because things were being reorganized.  Dkt. # 41-17, at 41.  Jones met with Bentley prior to the hearing and provided Bentley with the financial information that he had provided to the Board.  Dkt. # 41-8, at 25-26.

Bentley testified that, in his opinion, plaintiffs' terminations were inappropriate because there had been no effort to reduce expenditures and there was no effort to deal with the reduction in state aid when it occurred in July 2007.  Id. at 42.  He testified to a number of measures that could and should have been taken in July in order to reduce expenditures, other than cutting personnel.  Dkt. # 41-17, at 47.  Bentley also testified that he believed that Jones's projections were accurate and "I think the potential carry over that he has predicted for the worse [sic] case scenario twenty

two thousand dollars based upon additional revenue collected I believe that could be accurate." <u>Id.</u>

at 46.

Bentley also testified that he believed the Board was biased "based upon the fact that in many of the interviews [he] conducted it was told to [him] that January through December just prior to the board election that there was various information made by various individuals that Mr. Meadows and Ms. Prather were elected to the board that they were going to see that seven people were [ ] run off or they were got rid of." Id. at 51.

Plaintiffs' counsel made a closing argument.  He argued, "it is our contention . . . there was no RIF policy in place thus having zero evidence to show why these two particular position[s] should be eliminated as opposed to many others . . . . You have testimony about a financial situation that the school is in and no evidence to show that this is the best way of getting rid, in fact we have, we are getting rid of two principals that were here last year and we hired a new one or at least a part time one.  The real fact about this case, and it is very sad, everybody knows what is going on at this school this year, the whole community knows about it.  There has been a conspiracy that happened last year to get rid of certain employees, and some of them are gone. . . . So I ask tonight that you be quick about what you are doing because suppose you are going to be neutral to this hearing is a joke to me . . . ." Dkt. # 41-17, at 60.

The Board, with the exception of Horton, voted to adopt findings of fact.  The findings stated, in relevant part:

> The district is currently in the mi[d]st of a severe financial crisis.  If the district continues to spend funds at the current rate it will deplete its funds prior to the end of the [fiscal] year. . . . The district must immediately address this financial emergency by reducing its expenditures.  The reductions for the current year can only be made in personnel expenditures.  The district[']s administrative costs are excessive and should be reduced.  With the elimination of the full time elementary and full time high school principals position will have the least impact on the quality of education provided to the students and is in the best interest of the district. . . . The full time elementary school principal position and the full time high school principal position should be and here by are eliminated.

10

Dkt. # 41-17, at 64.  The Board, with the exception of Horton, voted to dismiss Tennison and James.

Id. at 65.

Total student enrollment in the district for the 2008-09 school year was fewer than 350

students.  Dkt. # 41-6, at 3.  During the 2008-09 school year, the District received approximately

$2,718,694.33 in revenue.  Dkt. # 41-21, at 2.  This was a decrease of $153,369.53 from the previous

year.  Id.  The District's expenses for the 2008-09 school year were $2,715,406.95.  This was a

decrease of $259,647.82 from the previous year's expenses.  Id.  Approximately $200,076.87 of this

decrease is attributable to a reduction in payroll-related expenses.  Id. at 3. The District ended the

2008-09 school year with a $332,991.81 carryover.  Dkt. # 52-30, at 1.  In Jones's opinion, a

$250,000 carryover is the absolute minimum for the District, and between $400,000 and $500,000

is appropriate.  Dkt. # 52-28, at 25.

The District did not employ a high school or elementary school principal for the 2009-10

school year; the superintendent served as high school and elementary school principal.  Dkt. # 41-9,

at 3.

D.     Relationship Between Plaintiffs and Defendants

Melvina Prather served as the interim superintendent from April 3, 2008 through June 30,

2008.  Dkt. # 52-4, at 2.  She testified that, on April 4, 2008, Meadows told her that "he had made

promises when he ran for the school board to get rid of some staff at the Prue School District."  Dkt.

# 52-4, at 2.  She testified that he stated he wanted Tennison, James, Louanne Cypert, Jeannie James,

Dawn Bunch, and Oleta Toothman gone because "they don't do their job, they can't do their job,"

and he "didn't think they were smart enough to do their job.  Plus, he had run on a platform, he had

promised that he would see those people were gone, and that's what he wanted to happen."  Dkt. #

11

52-4, at 3-4.  Prather did not tell these employees what Meadows said, but advised them that "they might want to look for other positions if things didn't change."  Id. at 8.  Prather testified that, on another occasion, Jackson told her that he wanted the same six people fired.  Id. at 11.

Cottrell was hired as superintendent in July 2008.  Dkt. # 52-9, at 6. Cottrell testified that, at a June 2008 executive session of the Board, Meadows told him that he wanted both administrators (James and Tennison) to be gone.  Dkt. # 52-8, at 2.  Horton, who was at that meeting, testified that Meadows "made the statement that there was some people, personnel, that he needed to get rid of and that he'd be looking for recommendations."  Dkt. # 52-9, at 11.  All Board members were present at that meeting.  Id. Cottrell also testified that, in July or August 2008, he overheard Meadows and Bill Pritchard discussing "getting rid of the two principals . . . ."  Dkt. # 52-8, at 3.  Cottrell believes that part of the problem that arose between himself and the Board was his refusal to fire plaintiffs.  Dkt. # 52-8, at 4.

On September 25, 2008, a petition was filed to impanel the grand jury to investigate wrongdoing or inappropriate behavior by the Board, particularly Traster, Hendrix, Meadows, and Jackson.  Dkt. # 52-14.  Also, at some time prior to this lawsuit, there was an investigation into theft of school property by Meadows's son.  The record does not contain any specific evidence of the outcome of that investigation or who was involved.

Tennison testified that she spoke out in favor of the grand jury petition in the community, but did not bring up the petition with Board members.  Dkt. # 52-12, at 2.  She believes she was retaliated against for her involvement in the petition and the incident with Meadows's son.  Dkt. # 52-12, at 4.  Tennison testified at a criminal hearing involving Meadows's son.  Dkt. # 52-12, at 4.

12

Tennison testified that Meadows told her she had "better watch [her]self" after a Board meeting during the 2007-08 school year.  Dkt. # 52-12, at 5.

James did not sign the petition.  She testified that she "voice[d] her concerns to anybody out of the -- or when I was not at work, if they asked my comments on that."  Dkt. # 52-16, at 3.  She generally made comments "out in the public in regards to the school and how [she] felt things were going in regards to what the school board was doing . . . ."  Id.

James also feels she was retaliated against because "no one ever asked [her] opinion in regards to the [elementary school principal position].  No one ever allowed [her] to speak on behalf of [her] school site of what needed to be done."  Id. at 4.

Horton testified that, by April 2008, he had formed an opinion that Meadows and Jackson were working together to have six District employees fired, including plaintiffs.  Dkt. # 52-9, at 4.  He believed that Hendrix and Traster went along with this plan.  Dkt. # 52-9, at 4.  Horton believes that Meadows ran for the Board "to atone or make up for things that had been done to him and his family by Prue," because Meadows did not come to school functions before he was on the Board.  Id. at 8.  Horton testified that he didn't necessarily believe that ending James's and Tennison's contracts was "not what's supposed to happen," but he felt that "it's not the way it's supposed to happen."  Id. at 10.

On December 8, 2008, Hendrix sent Meadows an e-mail.  Hendrix wrote:

> I was talking to Valerie and she said that she and Chrissie and Violet were thinking that it might not be a good time right now to make any mover [sic] waves than necessary with the election around the corner.  I think that might be a good idea.  There is time enough before the end of the year to do that. What do you think?  Valerie is going to call Eddie Boyer today and see what kind of a deal he will make me on some of the campaign things to put on the road.

Dkt. # 52-23, at 1.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 250.  In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most

favorable, <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

## III.

Plaintiffs bring the following claims against defendants: 42 U.S.C. § 1983 claims for violation of their substantive and procedural due process rights and retaliation in violation of their free speech rights; and state law claims for breach of contract, unlawful interference with contract, and conspiracy to interfere with their rights.   Defendants seek summary judgment on all claims.

A.     <u>Procedural Due Process</u>

The Fourteenth Amendment Due Process Clause prevents state actors from depriving plaintiffs of protected liberty or property interests without due process of law.  <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972).  In this case, it is undisputed that the certified administrator contracts gave plaintiffs protected property interests in their positions, and that they were entitled to pre-termination hearings.

> At a minimum, the Due Process Clause . . . require[s] notice and an opportunity for hearing appropriate to the nature of the case before deprivation . . . . These basic requirements must be determined with consideration of both the nature of the state function involved as well as the private interests affected by the governmental action. And in connection with possible judicial interposition in cases like this, we must be mindful of the commitment in our Nation of public education to the control of state and local authorities.

<u>Staton v. Mayes</u>, 552 F.2d 908, 912 (10th Cir. 1977).  The hearing must be before an impartial tribunal.  <u>Withrow v. Larkin</u>, 421 U.S. 35, 46 (1975).  "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing."  <u>Miller v. City of Mission, Kan.</u>, 705 F.2d 368, 372 (10th Cir. 1983).  However, "a substantial showing of personal bias is required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair."

Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 518 (10th Cir. 1998) (quoting Corstvet v. Boger, 757 F.2d 223, 229 (10th Cir.1985)).  The tribunal's honesty and integrity are presumed.  See Tonkovich, 159 F.3d at 518.  Therefore,"there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated." Mangels v. Pena, 789 F.2d 836, 838 (10th Cir. 1986).  The presence of even one biased member is enough to taint the tribunal and violate a plaintiff's due process rights.  Hicks v. City of Watonga, Okla., 942 F.2d 737, 738 (10th Cir. 1991).

Plaintiffs do not allege that they were not given sufficient notice of the hearing.  They argue that the hearing did not comport with due process because: individual Board members were biased against them; they were not provided discovery; and the hearing officer was paid by the Board's counsel.  The second and third allegations are without merit.  Plaintiffs have provided no caselaw to support their assertion that due process requires a school board to provide employees full discovery.  Plaintiffs' investigator discussed the school's financial condition with Jones and was provided with the materials Jones relied on in order to make his report.  Plaintiffs were permitted to cross-examine Jones, and their own witness, Bentley, testified that he generally agreed with Jones's assessment. Further, plaintiffs have provided no evidence that access to additional financial records  would have benefitted them.  Even after discovery in this case, they are unable to show that the Board should have known that Jones's predictions regarding the District's financial condition were inaccurate.  The fact that the District ended up with a carryover does not demonstrate that the District was not in a financial crisis in early 2009.  The undisputed evidence shows that a significant portion of the carryover is attributable to a reduction in personnel costs.

In Tonkovich, the Tenth Circuit rejected the plaintiff's claim that his pretermination hearing did not comport with due process because the hearing officer was employed by the agency that terminated him.   159 F.3d 519-20 ("Tonkovich has pointed to no law, clearly established or otherwise, that procedural due process includes a right to professional hearing officers or hearing officers not employed by the governmental body or agency taking the adverse action").   The fact that Miller was paid by the Board or through the Board's counsel did not deprive plaintiffs of due process.

The crux of plaintiffs' allegations is that the hearing was flawed because Meadows, Jackson, Traster, and Hendrix were biased against them.   In Staton, the plaintiff was a former school superintendent who was dismissed by the school board on charges of willful neglect of duty and incompetence.   553 F.2d 908.   Two members of the school board had previously voted against renewing the plaintiff's contract.   Id. at 910.   One board member made campaign promises that he would vote for a change in the superintendent.   Id.   Before the hearing, two board members stated in a newspaper advertisement that "no progress could be made with school problems until there was a new superintendent."   Id. at 913.   The board members testified at trial that they based their decisions to terminate the plaintiff on the evidence presented at the due process hearing.   Id. at 914. The Tenth Circuit held that the board members' public statements "reveal a tribunal not meeting the demands of due process for a hearing with fairness and the appearance of fairness."   Id.   The Staton court found that the statements went beyond "mere statements on a policy issue related to the dispute," and were "statements on the merits by those who must make factual determinations on contested fact issues of alleged incompetence and willful neglect of duty, where the fact finding is

critical." Id.  Thus, "[t]he hearing involved the possibility of an erroneous and unfair factual decision . . . ." Id.

In McClure v. Independent School District No. 16, 228 F.3d 1205, 1215 (10th Cir. 2000), there was evidence that, prior to a principal's termination hearing, school board members stated they wanted the plaintiff gone and would pay money to get rid of her.  The Tenth Circuit determined that these statements were akin to those made in Staton and created a genuine issue of material fact as to the school board's bias.  Id. at 1216.

1.      Meadows and Jackson

Plaintiffs allege that Meadows and Jackson made statements that they wanted Tennison and Jones terminated.  They base these allegations on Cottrell, Prather, and Horton's hearsay testimony that Meadows and Jackson made a few comments that they wanted certain employees, including plaintiffs, terminated.  They also provide as evidence speculation by the plaintiffs and others that defendants were biased.  The Court will not consider mere speculation as evidence on summary judgment.

This case differs from Staton and McClure in that the factual issue to be determined at the hearing was not plaintiffs' job performance, but the financial condition of the District.  The alleged statements by Meadows and Jackson were not pre-hearing assessments of the facts to be determined at that hearing.  Further, the few hearsay statements relied upon by plaintiffs do not rise to the level of the repeated public statements made by the defendants in Staton and McClure.  Plaintiffs have failed to make the "substantial showing of personal bias [that is] required to disqualify a hearing officer or tribunal in order to obtain a ruling that a hearing is unfair." Tonkovich, 159 F.3d at 518.  Meadows and Jackson are entitled to summary judgment on plaintiffs' bias claim.

18

2.      Traster and Hendrix

Plaintiffs' evidence that Traster was biased against them consists of Traster's 2007 "no" vote on their contracts and speculation that Traster "went along with" Meadows's plan.   This is insufficient to create a genuine issue of material fact as to Traster's bias.   It is undisputed that Traster voted to renew plaintiffs' contracts in 2008.  Further, the mere fact that a board member once voted against a plaintiff cannot create a presumption of bias.   Otherwise, one "no" vote would essentially disqualify that board member from ever hearing issues related to that employee.   Such a rule would eliminate the presumption that board members act fairly.  Tonkovich, 159 F.3d at 518. Plaintiffs also speculate that Traster was biased against them because of the grand jury petition. However, they provide no evidence supporting this inference other than the petition's existence and their assertions that Board members knew they supported it.   This is insufficient to create a genuine issue of material fact.   Plaintiffs have provided no other evidence that Traster was biased.

Plaintiffs' evidence that Hendrix was biased against them consists of the e-mail she sent to Meadows stating that it might be a good idea not to make waves in advance of a Board election. Even if Hendrix were referring to something having to do with the plaintiffs, the e-mail is not evidence of personal bias against them.   The e-mail is evidence that Hendrix was concerned about the effect that some action would have on an upcoming Board election.   The fact that plaintiffs may have supported the grand jury petition does not create a genuine issue of material fact as to Hendrix's bias.   Therefore, Traster and Hendrix are entitled to summary judgment on plaintiffs' procedural due process claims.

B.    <u>Substantive Due Process</u>

Plaintiffs allege that their substantive due process rights were violated.  However, plaintiffs have not explained <u>how</u> their substantive due process rights were violated, nor did they respond to defendants' arguments regarding substantive due process in their response brief.  <u>See</u> Dkt. # 52, at 22-25.  Substantive due process protections "are accorded primarily 'to matters relating to marriage, family, procreation, and the right to bodily integrity.'"  <u>Williams v. Berney</u>, 519 F.3d 1216, 1220 (10th Cir. 2008) (quoting <u>Albright v. Oliver</u>, 510 U.S. 266 (1994)).  "In extending these concepts to further bar 'certain government actions regardless of the fairness of the procedures used to implement them,' the Supreme Court has emphasized 'that only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'"  <u>Williams</u>, 519 F.3d at 1220 (quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998)).  Drawing all reasonable inferences in plaintiffs' favor, defendants' conduct does not rise to the level of a substantive due process violation. Plaintiffs' substantive due process claims fail as a matter of law.

C.    <u>Retaliation</u>

The First Amendment protects public employees' rights to speak as citizens on matters of public concern, and prevents public employers from retaliating against employees for such speech. The Tenth Circuit uses the five-step inquiry set out in <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968), as modified by <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006), to analyze public employees' retaliation claims.  <u>See</u> <u>Rohrbough v. Univ. of Colo. Hosp. Auth.</u>, 596 F.3d 741, 745 (10th Cir. 2010).  The <u>Garcetti/Pickering</u> inquiry is:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was

a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

Id. (quoting Dixon v. Kirkpatrick, 553 F.3d 1294, 1302 (10th Cir. 2009)).  The first three steps are questions of law to be resolved by the district court, while the last two are ordinarily for the trier of fact.  Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007).

Plaintiffs make vague references to their involvement in the investigation of Meadows's son and their general support of the grand jury petition.  In their response brief, plaintiffs describe their protected speech as "includ[ing] actions relating to the grand jury petition . . ., the criminal investigation into . . . Meadows'[s] son, and other happenings of [sic] related to the Prue School District." Dkt. # 52, at 26.  Plaintiffs provide no evidence of what these statements were, when they were made, to whom, or how they were relayed to defendants.  They merely allege that they were involved in these incidents and that the Board members knew about their involvement.  These vague and conclusory allegations are insufficient.  See, e.g., Harvey v. Baker, 242 Fed. App'x 547, 551 (10th Cir. 2007) (unpublished)[5] (holding that a plaintiff's vague, non-specific testimony was insufficient on its own to create a genuine issue of material fact that he engaged in protected speech, and noting that there was no evidence from any of the plaintiffs as to what they said and when); Craven v. Univ. of Colo. Hosp. Auth., 260 F.3d 1218, 1226 (10th Cir. 2001) (describing plaintiff's allegation that she was terminated in retaliation for speech "on other matters" as "patently inadequate," and noting that "it is the place of counsel, not the [court], to identify the specific instances of speech upon which the plaintiff seeks to base her claim"); Rankin v. Indep. Sch. Dist.

---

[5]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

No. I-3, Noble County, Okla., 876 F.2d 838, 847 (10th Cir. 1989) (affirming a directed verdict in defendant's favor where there was no evidence of the content, form and context of any protected speech).   Plaintiffs' mere speculation that Board members could have been aware of their involvement does not create a genuine issue of material fact.   Each defendant states that he or she based his or her decision to terminate plaintiffs' employment solely on the evidence presented at the hearing.   Dkt. ## 41-24, at 4; 41-25, at 4; 41-26, at 4; 41-27, at 4.

Because of the vague nature of plaintiffs' allegations, it is impossible to determine whether such speech was made by plaintiffs as citizens or as District administrators. See Braemmer-Hoelter, 492 F.3d at 1203 ("[t]he ultimate question is whether the employee speaks as a citizen or instead as a government employee - an individual acting 'in his or her professional capacity'"). For instance, if statements in connection with the investigation of Meadows's son were made pursuant to plaintiffs' duties as school administrators to report illegal activities at school, such statements might be within plaintiffs' official duties.   See Rohrbough, 596 F.3d at 746 ("speech pursuant to the employee's duty to report a particular activity is usually within that employee's official duties under Garcetti/Pickering").   Further, criticism of the Board's involvement in the day-to-day administration of the District may have been made "pursuant to [p]laintiffs' inherent duty as teachers to ensure" their students were being properly educated.   Brammer-Hoelter, 492 F.3d at 1204 (holding that "nearly all the matters [p]laintiffs claim they discussed were made pursuant to their duties as teachers").   The inadequacy of plaintiffs' evidence cannot create genuine issues of material fact for trial.   Therefore, defendants are entitled to summary judgment on plaintiffs' First Amendment claims.

D.     Breach of Contract, Interference with Contract, and Conspiracy Claims

Plaintiffs' remaining claims arise under state law.  Defendants are entitled to summary judgment on all of plaintiffs' federal law claims.  See Parts III. A-C, supra.  If a federal court has dismissed all claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction over remaining claims.  28 U.S.C. § 1367(c)(3); Gaston v. Ploeger, 297 Fed. App'x 738, 746 (10th Cir. 2008) (unpublished)[6] (stating that § 1367(c)(3) expressly permits a district court to decline to exercise supplemental jurisdiction over remaining state law claims after granting summary judgment in favor of defendant on federal law claims).  Plaintiffs' remaining claims arise under state law.  The Court cannot determine at this time whether it has diversity jurisdiction over these claims because the parties' states of citizenship are not part of the record.  Therefore, plaintiffs' state law claims will remain under advisement pending a determination of this Court's diversity jurisdiction.  After the jurisdictional issue is resolved, the Court will determine whether it will exercise supplemental jurisdiction.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Dkt. # 40) is **granted in part and remains under advisement in part**.  It is granted with respect to plaintiffs' federal law claims and remains under advisement with respect to plaintiffs' state law claims.

**IT IS FURTHER ORDERED** that the parties are to advise the Court, in pleading format, of the citizenship of plaintiffs and the individual defendants, as of the date the complaints were filed, no later than **September 3, 2010.**

---

[6]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

**DATED** this 1st day of September, 2010.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE